INTERNATIONAL TRAVEL ARRAN-
GERS, INC., Appellee,

v.

WESTERN AIRLINES, INC., Appellant.

No. 79–1221.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 15, 1980.

Decided June 10, 1980.

Clay R. Moore, Mackall, Crounse & Moore, Minneapolis, Minn., for appellant.

Harold J. Tomin, Los Angeles, Cal., argued, Boyd H. Ratchye and Stephen I. Halper, Doherty, Rumble & Butler, St. Paul, Minn., on brief, for appellee.

Before STEPHENSON and McMILLIAN, Circuit Judges, and THOMAS,* District Judge.

STEPHENSON, Circuit Judge.

Plaintiff-appellee, International Travel Arrangers, Inc. (ITA), a Minnesota corporation, organizes and arranges travel charter flights. Defendant-appellant, Western Airlines, Inc., is a regularly-scheduled aircraft carrier with routes including Minneapolis-St. Paul/other mainland cities to Hawaii; Minneapolis-St. Paul to Las Vegas; and various western states' cities to Mexico.

The district court,** adopting the conclusions and recommendations of the United States magistrate acting as a Special Master,[1] found that Western violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and entered judgment of trebled damages of $361,596.00 ($120,537.00 × 3) against Western and attorneys' fees and costs, of $213,390.87 and $10,771.40, respectively, to ITA.

Western, on appeal, challenges as clearly erroneous the findings of the Sherman Act violations, and challenges as excessive the amount of attorneys' fees. We affirm the district court's findings of Sherman Act violations and the damages resulting therefrom; we reduce the amount of attorneys' fees to $161,003.75.

Generally, ITA alleged at trial that Western, through a combination with its advertising agency, Batten, Barton, Durstine and

---

* The Honorable Daniel H. Thomas, Senior Judge for the United States District Court for the Southern District of Alabama, sitting by designation.

** The Honorable Miles W. Lord, United States District Judge for the District of Minnesota.

1. On July 8, 1977, the parties stipulated that the case would be tried by a jury presided over by United States Magistrate Robert G. Renner, and the district court ordered such. The trial proceeded on this basis. The jury returned a verdict in favor of ITA in the sum of $139,000. On February 22, 1978, a new trial was granted by the district court on the basis that a jury trial presided over by a United States magistrate was improper. The parties then stipulated to a retrial by Magistrate Renner acting as a Special Master pursuant to 28 U.S.C. § 636(b)(2) and Fed.R.Civ.P. 53. The stipulation and order thereon provided that the evidentiary proceedings and the jury trial would be deemed to be the proceedings before the Special Master.

On April 24, 1978, the transcript and documentary evidence of the jury trial, along with some additional testimony and exhibits, were offered and received. On June 7, 1978, the Special Master reported Findings of Fact, Conclusions of Law, and a Recommended Order for Judgment. On October 17, 1978, the district court adopted all but one finding of the Special Master and ordered judgment to be entered against Western.

On November 6, 1978, a separate hearing was held before the Special Master to determine attorneys' fees and costs. Judgment was entered by the district court on February 26, 1979, against Western in regard to fees and costs.

Osborn,[2] (BBD&O) conducted a campaign aimed at preventing ITA's development of travel group charters (TGCs) from becoming a competitive threat to Western; that Western, by use of its monopoly power, further attempted to prevent ITA's program of TGCs from becoming a competitive threat; and that Western succeeded in its activities, thereby causing damage to ITA.

Western challenges as clearly erroneous the Special Master's findings with respect to most of these factual allegations, and further specifically argues that the finding of a causal relationship between such alleged activities and ITA's alleged damages was clearly erroneous.

We shall review most of these claims in conjunction with a thorough review of the facts of this case. As a preliminary matter, however, we shall address Western's claim that the dispute between Western and ITA should initially have been referred to the Civil Aeronautics Board (CAB) under the doctrine of primary jurisdiction.

## I. Primary Jurisdiction

The CAB has both exclusive jurisdiction and primary jurisdiction over a variety of disputes within the air transportation system. The district court[3] addressed the issue of jurisdiction with respect to the instant case, *International Travel Arrangers v. Western Air Lines, Inc.,* 408 F.Supp. 431 (D.Minn.1975), and found that the federal district court had jurisdiction of the dispute and denied Western's motions to dismiss or to refer the matter to the CAB.

On appeal, Western argues that the CAB had primary jurisdiction over the case under (1) 49 U.S.C. §§ 1302, 1381 (§ 1302 amended 1978) and 14 C.F.R. § 399.80; (2) 49 U.S.C. § 1482 (amended 1977 and 1978) and 14 C.F.R. § 302, inasmuch as the dispute concerned allegedly unfair competitive practices.

49 U.S.C. § 1302 (amended 1978) defines the matters of public interest which the CAB must consider in performance of its powers and duties. 49 U.S.C. § 1302(c) (amended 1978) specifically mentions that one of these considerations shall be:

[t]he promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, *or unfair or destructive competitive practices*[.]

*Id.* (emphasis added).

49 U.S.C. § 1381 states that the CAB "may, upon its own initiative or upon complaint by any air carrier * * * or ticket agent" investigate and make determinations in regard to any alleged "unfair or deceptive practices or unfair methods of competition." This same section gives the CAB authority to issue cease and desist orders in connection with such practices or methods of competition. 49 U.S.C. § 1482 (amended 1977 and 1978) and 14 C.F.R. § 302[4] are the statutory provisions and regulatory rules for the relevant administrative proceedings.

14 C.F.R. § 399.80 enumerates those practices which the CAB regards as unfair or deceptive or as an unfair method of competition. For example, 14 C.F.R. § 399.80(n) designates as one of these practices: "[m]isrepresentation as to the requirements that must be met by persons or organizations in order to qualify for charter or group fare flights." It is one of ITA's arguments that through false and deceptive advertising, Western misrepresented ITA's TGC requirements and operations.

49 U.S.C. § 1384 (amended 1978) is a specific immunity clause of the federal avi-

---

**2.** The individual names in BBD&O have been spelled interchangeably as Batton; Barston; Dirsten & Dursten; & Osborne. We have spelled the names as they appear on a BBD&O letterhead.

**3.** The Honorable Miles W. Lord, United States District Judge for the District of Minnesota.

**4.** 14 C.F.R. § 302 has been amended in several sections since the occurrence of the activities involved in this lawsuit. For purposes of our discussion, however, citations to the current regulations will suffice inasmuch as the fact that the administrative procedures were somewhat different during the time frame of the activities of Western is immaterial to the question of primary jurisdiction.

ation program, which provides in regard to the antitrust laws, that "[a]ny person affected by any order made under [49 U.S.C.] sections 1378, 1379, or 1382 * * * shall be, and is hereby, relieved from the operations of the 'antitrust laws.' " As is apparent by the description of the statutory and regulatory authority upon which Western relies, Western does not allege that this immunity grant covers the instant case. Thus our discussion need not deal with exclusive jurisdiction with the CAB, but rather only that of primary jurisdiction.

*Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) provides us with the primary considerations relevant to the doctrine of primary jurisdiction. The regulatory agency involved in *Ricci* was the Commodity Exchange Commission. The plaintiff alleged that he was excluded from trading on the Chicago Mercantile Exchange pursuant to an unlawful conspiracy in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. While acknowledging that the Commission could not immunize conduct from the antitrust laws, the Supreme Court determined that the Commission had primary jurisdiction because (1) a factual determination of whether or not the action taken by the Commission was pursuant to a valid rule would clarify what question was necessary for the Court to decide—*i. e.*, (a) if the action was pursuant to a valid rule, the question would be whether the rule is insulated from the antitrust laws, *see Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918) (reasonable restraint of trade); (b) if the action in question was contrary to the rules, the antitrust action would presumably "take its normal course," *Ricci v. Chicago Mercantile Exchange, supra*, 409 U.S. at 304, 93 S.Ct. at 581; (2) that there was statutory authority for the Commission to settle the dispute; and (3) the adjudication of the dispute by the Commission would materially aid the Court "in arriving at the essential accommodation between the antitrust and the regulatory regimes." *Id.* at 307, 93 S.Ct. at 583.

■ The purpose of these considerations is to provide focus upon the controlling principle involved in the conflict of regulatory and judicial activity, which is that the courts "must refrain from imposing antitrust sanctions for activities of debatable legality * * * in order to avoid the possibility of conflict between the courts and [agencies]." *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 220, 86 S.Ct. 781, 786, 15 L.Ed. 709 (1966).

■ While the CAB has statutory and regulatory authority to determine unfair competition (the second consideration listed), it is difficult to see how a determination by the CAB, as to whether Western's activities constituted, *e. g.*, unfair competition, would clarify any questions presented to this court—the question would still be whether those activities constituted an antitrust violation. For as we have pointed out, there is no basis for antitrust immunity under action taken pursuant to 49 U.S.C. §§ 1302, 1381 or 1482.

This differs from the factual situation in *Ricci v. Chicago Mercantile Exchange, supra*, inasmuch as in *Ricci*, as is apparent by the Court's observation, the Commodity Exchange Act "contemplates that the Exchange and its members will 'engage in restraints of trade which might well be unreasonable absent *sanction*' by the Act." *Id.*, 409 U.S. at 304, 93 S.Ct. at 581, *quoting Silver v. New York Exchange*, 373 U.S. 341, 360, 83 S.Ct. 1246, 1258, 10 L.Ed.2d 389 (1963) (emphasis added). If the action in *Ricci* was determined by the Commission to be within the Exchange rules, there would be an affirmative sanction by the Exchange of the activities in question. In the instant case, even if the CAB would determine that there was no violation by Western of the CAB prohibitions against unfair competition, this would not be an affirmative sanction of the activities by the CAB. Thus a finding of an antitrust violation by this court would *not* create a substantial conflict. *Carnation Co. v. Pacific Westbound Conference, supra*.

A determination by the CAB, as to whether or not the activities constituted

unfair competition, would not necessarily aid the court in arriving at an accommodation between the CAB regulations and the antitrust laws, for there would not necessarily exist a conflict even if the CAB decides one way and this court holds the opposite.

We hold that this court properly has jurisdiction of this case.

## II. Factual Findings by the District Court

### A. *General Overview*

As defined by the Special Master in his findings of fact, a travel group charter is a form of charter air travel in which the individual traveler is a party to the charter contract incurring liability for the prorata share of the charter cost and running the risk that his cost may increase, depending upon the load factor ultimately achieved. TGCs are organized by independent charter organizers. * * In enacting the TGC concept, the CAB's purpose was to provide charter competition to the regularly-scheduled airlines, and low air fares to the public at large.

ITA began operations of TGCs in the summer of 1973 with the Minnesota State Automobile Association (MSAA) acting as a wholesaler and retailer for the TGCs organized and arranged by ITA.[5] The TGCs first operated were flights from Minneapolis-St. Paul to London.

Initially planned for 1974 by ITA were eight Hawaii flights, four Mexico flights and thirteen London flights. Preparation

and advertising for some of these began at least as early as 1973. Later it was decided to only schedule four Hawaii flights.

During the summer of 1973, two travel agencies began advertising Hawaii TGCs for departure during January-March 1974. Those travel agencies were Mainline Travel and Travel World.[6] These two travel agencies, along with MSAA, comprised a major portion of the Minnesota travel market; Mainline and MSAA were the two largest travel agencies in Minnesota.

Also during the early part of 1973, TGCs were advertised in west coast newspapers for TGCs from west coast cities to Hawaii. Western Airlines, concerned by the competitive threat of these west coast TGCs, sought the assistance of BBD&O, its advertising agency, in formulating an advertising response. As a result, and with aggressive assistance[7] from BBD&O, Western caused an ad to appear in several major west coast papers which had the effect of reducing competition from west coast TGCs. This was one of Western's first acts in what has been referred to as an anti-TGC campaign. This finding by the Special Master, of effectiveness of the ad, is supported by the testimony of Burt D. Lynn, Vice-President of Advertising and Sales Promotion of Western Airlines, who testified that the feedback from the travel agents on the west coast was that the ad was effective.[8]

On August 30, 1973, ITA and MSAA (who was to act as wholesaler and handle reservations and bookings for the TGCs) held a kick-off party for the Hawaii and Mexico

---

**5.** ITA was formed in June of 1972 and initially packaged affinity group charters. As defined by the Special Master, "[a]ffinity charters involve groups having some community interest apart from transportation, for example, membership in a club, who engage an aircraft for transportation to be paid for on a pro-rata basis." After the CAB adopted, in September 1972, regulations concerning TGCs, ITA entered this market.

**6.** Travel World is also referred to as Travel Center in the record.

**7.** Burt D. Lynn, Vice-President of Advertising and Sales Promotion for Western Airlines, testified that he contacted BBD&O to begin work on an advertising response to the west coast TGCs, and that he was informed by John

Doyle, of BBD&O, that BBD&O was already working on an advertising response.

Lynn additionally testified that Jack Bernardy, BBD&O Accounts Supervisor for Western Airlines, gave Lynn an initial draft of the advertisement, that Lynn made a few changes, but that the ad as published was substantially the same as the initial draft.

**8.** Additionally, Western chose not to rerun the ad inasmuch as TGCs had ceased doing well on the west coast and chose to run a very similar ad in the Minnesota papers. Both of these factors may have been taken into consideration in regard to the findings by the Special Master that the ad was effective.

TGCs. ITA distributed information about the TGCs to the travel agents in attendance. The first ITA/MSAA Minnesota ads for the Mexico and Hawaii TGCs appeared on September 2, 1973.

Western caused to be published on Sunday, September 16, 1973, an ad in the Minneapolis paper, which, but for a few changes, was identical to the ad Western caused to be published in the west coast papers early in 1973. There was also radio advertising (prepared by BBD&O) aired on a St. Paul-Minneapolis station between September 13 and September 16, 1973, which advised listeners to "[b]e sure to see the Western Airlines ad in the travel section of your Sunday newspaper" and "[l]ook for the full-page Western Airlines ad in the travel section of your Sunday newspaper."

Finally, there was a letter on Western Airlines' stationery addressed to "Dear Partner in Travel," and dated September 13, 1973, signed by Lynn Zumbrunnen, Regional Director, Marketing/Sales for Western Airlines. The letter was drafted by BBD&O and sent to Minnesota travel agents along with a proof copy of the September 16 ad.[9]

Additional acts by Western with respect to ITA's TGCs include a letter from Western addressed to Mainline Travel which discouraged the participation of Mainline with TGCs. The April 25, 1973 letter read as follows:

Dear Warren [President-Mainline Travel]:

By now you may feel that I have an obsession against Travel Group Charters, and that may be so, but I am more concerned with keeping one of our top producing agents in a strong, healthy position.

I certainly don't believe that involving yourself in TGCs into the Pacific is the answer. At least not at this point and time. I think the case in point is capsulized very well in the attached article that appeared in the April 18th issue of the Honolulu Advertiser. I believe you will find it interesting reading.

Sincerely,
/s/ Bill
[W. E. Balfour, Vice-President Marketing/Passenger Sales, Western Airlines]

One other specific piece of evidence (we have not attempted to be all-inclusive in our restatement of the facts) is a recommendation from Zumbrunnen (Western) to Balfour (Western) which suggested, *inter alia*, a rerun of the west coast ad in the Minnesota papers. The recommendation read, in relevant part:

As we have discussed with you quite frequently during the last few days regarding the pending TGC and ITC programs scheduled to depart the Twin Cities during the first quarter, the following recommendations and observations are for your consideration:

Today we held a staff meeting and quite extensively kicked around the programs as to their validity from a competitive evaluation. It was agreed by all that the existing programs create a very serious competitive situation. Our feedback from the travel agents indicate that they will support these programs—ITC programs to a greater extent than TGC programs. This observation I heartily agree with and share in our staff's observations.

\* \* \* \* \* \*

---

**9.** In relevant part, the letter read as follows:

There has been a good deal of talk and activities centered around Travel Group Charters. Obviously, Western has a point of view on TGCs. Frankly, we don't think they are a good deal for the public or for the travel industry. Let me tell you why.

\* \* \* \* \* \*

Most TGCs are filed for peak-season departures. We wonder if the entire travel industry isn't doing itself a good deal of harm to take its prime vacation destinations and sell them at bargain basement rates during a period when that product is at peak demand.

\* \* \* \* \* \*

I have attached a proof of the first advertisement that is scheduled to run in newspapers in your area on Sunday, September 16. I believe you will find it a very effective tool in explaining to your clients the problems inherent in TGCs. When they decide to book their Hawaiian vacation on a scheduled carrier, we hope you will make sure it is on Western Airlines, "The Only Way To Fly".

It was nearly unanimous that a positive reaction to this competitive situation be made by Western Airlines prior to the middle of September. This successful reaction would be a rerun of our TGC advertisement which appeared in the Los Angeles area tailored to this situation. In addition to the ad, a direct mail program regarding the same would be sent to all travel agencies. If it is possible to delay any fare increases until Spring, the ad campaign might not be necessary with the exception of a direct mailer to the travel agents. This, of course, is very serious business; and consequently, we would like such a mailer to be reviewed by general office staff.

### B. *The Ad*

Western first contends that the Special Master erred in finding the September 16

newspaper ad to be false, misleading and deceptive.[10] The Special Master found as follows:

20. On September 16,1973, in response to the substantial competitive threat, Western caused the publication of an ad similar to its west coast ad in the Twin Cities and other larger cities in Minnesota (Ex. 21). The ad appeared in the Travel Sections of the Minneapolis and St. Paul Sunday papers (as well as those of Rochester, Duluth, and other Minnesota cities). As with the west coast ads, it was substantially the work product of BBD&O.

21. It was false, misleading, or deceptive in the following ways:

a. The statement:

"No travel group charter has ever taken off to Hawaii from the Twin Cities. All those scheduled had to be cancelled."

---

**10.** Western asserts, as a defense to ITA's allegations, that ITA's TGC advertisements—appearing before Western initiated its anti-TGC campaign—were deceptive, illegal and fraudulent, and thus Western should not be held liable for its own challenged conduct. We find the Special Master's reliance on *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 138–40, 88 S.Ct. 1981, 1984–85, 20 L.Ed.2d 982 (1968) to be on point and controlling:

> Although *in pari delicto* literally means "of equal fault," the doctrine has been applied, correctly or incorrectly, in a wide variety of situations in which a plaintiff seeking damages or equitable relief is himself involved in some of the same sort of wrongdoing. We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. It was for this reason that we held in *Kiefer-Stewart Co. v. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), that a plaintiff in an antitrust suit could not be barred from recovery by proof that he had engaged in an unrelated conspiracy to commit some other antitrust violation. Similarly, in *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), we held that a dealer whose consignment agreement was canceled for failure to adhere to a fixed resale price could bring suit under the antitrust laws even though by signing the agreement he had to that extent become a participant in the illegal, competition-destroying scheme. Both *Simpson* and *Kiefer-Stewart* were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-

present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct. *Kiefer-Stewart, supra.*

> In light of these considerations, we cannot accept the Court of Appeals' idea that courts have power to undermine the antitrust acts by denying recovery to injured parties merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others. * * * We therefore hold that the doctrine of *in pari delicto*, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action.

The only exception that *Perma Life* allows is when the illegal conspiracy "would not have been formed but for the plaintiff's participation." *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279 (9th Cir. 1976), *cert. denied*, 431 U.S. 938, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1971). This exception is not applicable here.

was false and misleading in that if this language is interpreted as stating that all Twin Cities/Hawaii TGCs ever scheduled had been cancelled, it was false since Mainline Travel and MSAA/ITA were advertising Twin Cities/Hawaii TGCs simultaneously with Western's ad and the TGCs had not been cancelled. If the language is interpreted as meaning that all Twin Cities/Hawaii TGCs scheduled to depart prior to September 16th had been cancelled, it was equally misleading since none had ever been so scheduled.

b. The statement:

"The upshot of it all being that you can plunk down a couple of hundred dollars (or more) for airfare and even more for ground arrangements. And end up going absolutely nowhere."

was misleading in that under the TGC regulations, it was impossible for a prospective passenger to ever forfeit money paid to the organizer for ground arrangements.

c. The statement: "Find out your hotel (if you buy an optional ground package). Nobody's sure yet either." was false and misleading in that the statement was not true as of the date of the ad for ITA's TGCs. Mr. Russell and Mr. Edberg of MSAA testified that on September 16, a passenger's hotel was known at the time of reservation.

d. The ad was false and misleading in stating that the TGC organizer could charge a five percent transfer fee. By contract ITA could not do so.

e. The ad was false and misleading in stating that the TGC passenger was "virtually out of luck" within 45 days before departure. The standby list could be utilized within 45 days of departure and in fact was so used on ITA's 1973 TGCs to London. For this same reason, the statement "If your boss switches your vacation, for example, you've had it," was misleading.

f. The statement that the travel agent "understands all the pros and cons of Travel Group Charters" was misleading since at the time of the ad travel agents did not know much about the TGC concept. Also, Western was, at the same time, discouraging travel agents from selling TGCs.

g. The statement:

"Nationally, over 2,600 travel group charters have already been cancelled. That's 9 out of 10 flights that were scheduled."

was misleading since this national experience was not representative of the Twin Cities' experience with TGCs. In particular, all of the TGCs scheduled out of Minneapolis/St. Paul to London in 1973 and operated by ITA/MSAA operated successfully. It was also misleading because it referred to flights listed in prospectuses filed with the CAB and was not limited to cancellations occurring because of inability to attract sufficient passengers to allow operations under the Rules, the only circumstance which would be relevant to the alleged informational purpose of the ad.

Western argues, *inter alia*, that (1) the seven specific statements were not found to be *materially* false or misleading; (2) the ad was not considered in the context in which it appeared (a "lengthy travel section of a bulky Sunday newspaper along with a large number of other travel ads," quoting from Western's brief); and (3) that in any event, the statements in the ad are not false, misleading or deceptive.

We think that implicit in the causation of damage finding, discussed *infra*, materiality is shown. Secondly, the ad was submitted in at least one exhibit in the context of the newspaper travel section and the Special Master had the opportunity to consider the ad in that context.

As to the content of the ad itself, we find it unfruitful, and additionally unnecessary, to examine individually the seven allegedly false, deceptive or misleading statements. The issue is first, whether the ad as a whole, contributed to the "anti-TGC campaign," and second, whether the campaign constituted an unreasonable restraint of trade under section 1 of the Sherman Act.

It will be relevant, however, in the analysis leading to a determination of reasonableness of the anti-TGC campaign, to consider the personality of the ad as a whole. For an example of one of the stronger of the Special Master's seven findings insofar as ITA is concerned, Western admits that the statement in Finding 21(a), "[a]ll those scheduled had to be cancelled," was incorrect; on September 16, when the ad appeared, ITA and MSAA, Mainline and Travel World were actively promoting their Hawaii TGCs—obviously they were not cancelled. The weakest finding of fact insofar as ITA is concerned is Finding 21(f)— "[t]he statement that the travel agent 'understands all the pros and cons of Travel Group Charters' was misleading." What is most important here is not that the travel agents did not know all the pros and cons of TGCs, but that, as part of its overall anti-TGC campaign, Western was (1) discouraging travel agents from selling TGCs to their customers and, additionally; (2) stating that Western hoped the travel agents would book their customers on Western, and finally; (3) telling potential customers, through the September 16 ad, to see their travel agent for supposedly an objective appraisal of TGCs.

Thus keeping in mind that the ultimate question is whether the anti-TGC campaign was an unreasonable restraint of trade under section 1 of the Sherman Act, we hold that there is sufficient evidence to support the Special Master's finding of facts that the ad is false, deceptive and misleading. We further agree that the ad was part of the anti-TGC campaign and must be considered in determining whether or not an unreasonable restraint of trade occurred.

## C. Travel Agent Letter

The second major act in the anti-TGC campaign was mailing a copy of the ad, along with the letter drafted by BBD&O, to travel agents in Minnesota.[11] The contents of the ad have already been discussed. The letter, the Special Master found, was designed to discourage the travel agents from participating in TGCs and from selling TGCs to the public. The letter speaks for itself, Part II A *supra*, and we agree that it was part of the anti-TGC campaign and must be considered when determining the reasonableness of the campaign under Sherman § 1.

## D. Radio Commercial

The final major segment of the alleged anti-TGC campaign is the radio advertising. The radio commercial refers to the September 16 ad; the contents of the ad have been discussed. Other than that, it is only necessary at this point to note that the radio advertising was also part of the anti-TGC campaign and must be considered when determining the reasonableness of the campaign.

## E. Other Activities

Although they were not specifically directed at the Minnesota TGCs, also relevant to the factual background of our analysis are Western and BBD&O's activities on the west coast in regard to TGCs. Western contacted BBD&O in reference to a west coast advertisement to meet the competitive threat of TGCs against Western; the ad was run in February 1973 in several major west coast papers; and the ad was found to have effectively reduced competition from TGCs on the west coast. All of the foregoing can be used as a base for reference in connection with Western's knowledge of the impact of the ad and Western's reason for using the ad in Minnesota.

Additionally, credibility for ITA's charge of an anti-TGC campaign can be gleaned from (1) the April 25, 1973 letter from Western to Mainline, pp. 11–12 *supra*, discouraging the use of TGCs; (2) Zumbrunnen's recommendation to Balfour that the west coast ad should be used in Minnesota, pp. 12–13 *supra*; (3) the knowledge that TGCs were actively opposed by Western on the west coast; (4) the fact that by April 1973, Western's Minneapolis personnel had

11. *See* note 9 *supra*.

been instructed by Balfour to monitor, as closely as possible, TGC activity in Minneapolis-St. Paul; and (5) the fact that in August 1973, Balfour told the Travel Agent's Advisory Council that Western was opposed to TGCs on the west coast.

Thus, we specifically hold that there is sufficient evidence to support the Special Master's conclusion that these activities were part of an anti-TGC campaign.

### III. Contract, Combination or Conspiracy

Having determined the nature of the above activities and having determined that they constituted an anti-TGC campaign, we must now determine whether these activities were an unreasonable restraint of trade under section 1 of the Sherman Act.

██ To find a violation of section 1, there must first be a finding of a contract, combination or conspiracy. Western argues that the district court erred in finding that BBD&O's contribution to the activities was sufficient to establish that a contract, combination or conspiracy existed between Western and BBD&O. Primarily, Western contends that BBD&O acted only as an agent providing technical services to Western, and that this is not the type of combination that the Sherman Act covers.

The Special Master found as follows:

9. Batten, Barton, Dirsten and Osborne (BBD&O) [12] was at all relevant times engaged in the advertising business. BBD&O and Western were at all relevant times separate and independent legal entities. Between 1970 and 1974, Western was the largest of six accounts at the Los Angeles office of BBD&O.

10. In January of 1973, Bert Lynn, Western's vice president for advertising and promotion, made the decision to seek the help of BBD&O in formulating a response to meet the competitive threat of TGCs operating between west coast cities and Hawaii. Lynn and Willis Balfour, Western's vice president for passenger sales, had agreed that an advertisement would be the best way to meet this competitive threat.

11. Upon contacting BBD&O's John Doyle, Lynn was told that BBD&O had already commenced work on an advertisement discouraging use of TGCs. The person at BBD&O in charge of the Western account was Jack Bernardy.

12. Although Lynn gave Bernardy general guidelines concerning the ad and reviewed BBD&O's ad copy, the ad as published was the result of BBD&O's active participation and was substantially the work product of BBD&O.

\* \* \* \* \* \*

22. Although the Twin Cities ad was initially scheduled to run at least twice, BBD&O issued the order to cancel it after its first run because of "copy problems."

23. BBD&O also prepared radio advertising discouraging use of TGCs for broadcast on WCCO, the Twin Cities station with the highest listening ratings. It utilized live announcements by some of the station's most popular announcers (Ex. 106).

24. BBD&O actively and knowingly participated in the Western anti-TGC campaign in Minneapolis and St. Paul in September 1973.

25. BBD&O was at all times aware that the purpose of the campaign was to prevent the TGC from becoming a competitive threat to Western's regularly scheduled air service.

26. BBD&O actively, knowingly, and voluntarily engaged in a course of conduct with Western designed to prevent TGCs from becoming a competitive threat to Western.

Western does not attempt to distinguish the instant case from *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). In *Albrecht*, the defendant had hired Milne Circulations Sales, Inc. to call or personally solicit newspaper customers to switch to direct delivery of the newspaper instead of continuing delivery by the plaintiff. The Supreme Court ruled that there was a combination within section 1 between the newspaper, Milne and Kroner, the per-

---

**12.** *See* note 2 *supra.*

son hired to take over the route in the meantime. The Court noted that the efforts of Milne and Kroner had some effect on the customers, and while undoubtedly Milne was acting to earn a fee, it was aware of the aim of the newspaper. The aim or goal of the paper was to get the plaintiff to lower his prices.

We perceive no material distinction between the instant case and *Albrecht*. The Special Master found, and there is sufficient evidence to support the fact, that BBD&O was aware that the purpose of the anti-TGC campaign was to prevent TGCs from becoming a competitive threat to Western's regularly scheduled (monopoly) air service to Hawaii.

Thus, the fact that BBD&O participated in the anti-TGC campaign and that BBD&O "materially aided the accomplishment of Western's plan"[13] with the knowledge of the purpose of such campaign is sufficient to satisfy the *Albrecht* requirements. *Tamaron Distributing Corp. v. Weiner*, 418 F.2d 137, 139 (7th Cir. 1969), *quoting Albrecht v. Herald Co., supra*, 390 U.S. at 150, 88 S.Ct. at 871. *But see Tamaron Distributing Corp. v. Weiner, supra*, 418 F.2d at 140 (Knoch, J., concurring). *See generally Quality Mercury, Inc. v. Ford Motor Co.*, 542 F.2d 466 (8th Cir. 1976), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977).

### IV. Unreasonable Restraint of Trade—Sherman § 1

Having decided (1) that there were activities in which BBD&O and Western engaged that constituted an anti-TGC campaign and (2) that BBD&O's participation was sufficient to satisfy the contract, conspiracy or combination requirement of section 1, we now must reach the ultimate question of law—whether or not the anti-TGC campaign constituted an unreasonable restraint of trade under section 1 of the Sherman Act.

The relevant factual findings and conclusions of law, as stated by the Special Master, are as follows:

**13.** *See* note 7 *supra*.

### FINDINGS OF FACT

\* \* \* \* \* \*

58. Western's purpose in embarking on its anti-TGC campaign in the Twin Cities and other Minnesota cities was to prevent the TGCs from becoming a competitive threat in this area.

59. Its purpose was not to merely inform the public or to speak out on a political issue. If such had been the case, a substantially misleading or deceptive campaign would have been unnecessary.

\* \* \* \* \* \*

61. Western was aware that the natural and probable consequences of its veiled threats to MSAA to reduce preferred allocation of Group 60 space was to induce MSAA to cancel the TGC plans it had with ITA.

62. Western's anti-TGC campaign was knowingly, intentionally, and purposefully designed to eliminate TGCs as a competitive force to Western's regularly scheduled air service, and Western was aware that such elimination of competition would be the natural and probable consequence of its conduct.

### CONCLUSIONS OF LAW

\* \* \* \* \* \*

6. BBD&O did in fact combine and conspire with Western in restraint of trade by knowingly and actively participating in a course of anti-competitive conduct.

7. Western's publication of the ad of September 16, 1973, was part of a course of conduct constituting an unreasonable restraint of trade. The ad was false, misleading, and deceptive. Publication of the ad was not protected by the First Amendment of the United States Constitution.

8. Western's distribution of the "Dear Partner in Travel" letter to travel agents in Minnesota was part of a course of conduct constituting an unreasonable restraint of trade.

\* \* \* \* \* \*

10. Western's course of conduct was deliberately and purposely designed to prevent the TGC, a lawfully enacted concept, from effectively competing with regularly scheduled air service, in direct contravention of an express policy of the United States government.

11. Western's course of conduct was in violation of Section 1 of the Sherman Act and caused damage to ITA.

12. * * * Western possessed monopoly power in [the Twin Cities/Hawaii travel] submarket.

 * * * * * *

18. Western entered into the combination with BBD&O with the specific intent to monopolize that portion of interstate commerce consisting of individually ticketed air transportation on the Twin Cities/Hawaii route.

What is preliminarily a matter for discussion is the questions which are not presented to us. We are not called upon to determine if the newspaper ad, the radio commercial or the travel agent letter are unreasonable restraints of trade in and of themselves.[14] To examine the purpose or effect of each of these individually would not be fruitful, nor would it be a controlling analysis. Each of these occurrences is merely an act contributing to the anti-TGC campaign.

Deciding as a matter of law whether or not the anti-TGC campaign was an unreasonable restraint of trade is a difficult ques-

tion. It is not a conventional "restraint of trade," i. e., a tie-in, price fixing or territorial division.[15] It is, in fact, a form of competition and because competition is the object sought to be preserved by the antitrust laws, we must be careful in drawing a line between fair competition, unfair competition and competition that is so unfair as to rise to the level of an unreasonable restraint of trade. See Northwest Power Products, Inc. v. Omark Industries, Inc., 576 F.2d 83, 88–90 (5th Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979).

■ The traditional analysis for examining a restraint of trade under the rule of reason was struck in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). The courts must examine the purpose, the market power and the anticompetitive effect of the restraint, and thus arrive at a conclusion as to the reasonableness of the restraint.

The market power is relevant as part of the overall analysis inasmuch as it has been accepted in antitrust law that "Davids can engage in many kinds of conduct in the marketplace that are forbidden to Goliaths." Purex Corp. v. Procter & Gamble Co., 596 F.2d 881, 885 (9th Cir. 1979). In the instant case, Western does not dispute that it had monopoly power over the Twin

---

14. Western devotes much time and effort to a First Amendment defense, arguing in connection with this defense that the Sherman Act cannot be violated by the publication of an ad. We find no merit in this argument. First, the First Amendment/Sherman Act relationship is embodied in the Noerr-Pennington doctrine, United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) and Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and the basis of this doctrine is not an all-encompassing First Amendment protection. While consideration of the First Amendment is an inherent part of the Noerr-Pennington analysis, the basis is that activities done in furtherance of the right to petition are not within the scope of the Sherman Act. State of Missouri v. National Organization for Women, Inc., 620 F.2d 1301 (8th Cir. 1980).

Secondly, the ad is not the violation in this case; the violation is the anti-TGC campaign.

Finally, Western admits that conduct otherwise illegal cannot be immunized merely because it was carried out by means of speech. Consequently, simply because part of the anti-TGC campaign (which we hold to be an unreasonable restraint of trade) was carried out by means of "speech," does not create a basis for immunization.

15. But see Perryton Wholesale, Inc. v. Pioneer Distributing Co., 353 F.2d 618, 621–22 (10th Cir. 1965), cert. denied, 383 U.S. 945, 89 S.Ct. 1202, 16 L.Ed.2d 208 (1966) (conspiracy to suppress competition through the elimination of competition by unfair means is an unreasonable restraint of trade).

Cities-Hawaii travel route. Thus, Western's market power was great, and the limitations upon Western's activities in regard to "competition" increased somewhat commensurately with its power.[16] (While Western's monopoly power was over the Hawaii travel route, the anti-TGC campaign was not limited to Hawaii TGCs.) *See* pp. 1272–1273 *infra*.

▌ The crux of the reasonableness of the restraint in this case is the purpose of the anti-TGC campaign. For the antitrust laws would not be served at all were we to prohibit even a monopolist from competition.[17] *See Union Leader Corp. v. Newspapers of New England Inc.*, 284 F.2d 582, 584 (1st Cir. 1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). On the other hand, improper competition, at some point and under some circumstances, can be a violation of Sherman section 1. *Atlantic Heel Co. v. Allied Heel Co.*, 284 F.2d 879 (1st Cir. 1960). We hold that the anti-TGC campaign was an unreasonable restraint of trade.

Important to our ruling is that the purpose and direction of the anti-TGC campaign was not to compete with ITA's TGCs, but rather was to prevent TGCs from becoming a competitive threat to Western's regularly scheduled air service. Further, the means by which Western sought to achieve this end was not fair competition, but rather an organized full frontal attack which (1) used false, misleading and deceptive advertising and (2) was directed at (a) consumers and (b) travel agents. While it might have been reasonable for a monopolist such as Western to conduct an *aggressive* anti-TGC campaign against ITA's TGCs, *see William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 461 F.Supp. 410, 425 (N.D.Cal.1978), it was not reasona-

ble for a monopolist such as Western to use the means described above with the purpose of preventing any effective competition from ITA's TGCs. See, *i. e., George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 562 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975) wherein the court notes that distinctions exist (although in this case in regard to a per se analysis) between "crippling the organization of a competitor" and "beating it in the market place," or between "going to the jugular and going to one of the lesser arteries." This is the difference we perceive in this case. Western did not choose to compete with ITA's TGCs, but rather chose to prevent TGCs from becoming competition in the market place. Under the rule of reason, Western's anti-TGC campaign is an unreasonable restraint of trade.

The tremendous effect of Western's campaign makes clear the unreasonableness of the restraint of trade inherent in the pervasive anti-TGC campaign. This is discussed in Part VII A *infra*.

## V. Sherman § 2 Findings of Fact

During the relevant time period, Western operated a promotional device known as the Group 60 Fare on its Twin Cities/Las Vegas route in order to compete with affinity charters, defined note 5 *supra*. Western had a monopoly in this travel market as it was the only regularly scheduled air carrier having direct and non-stop flight service between the Twin Cities and Las Vegas.

Promotional group fares such as the Group 60 Fare, as described by the Special Master, are designed to stimulate traffic and provide full-plane economies characteristic of charters. Western would allocate to one travel agent (serving as a wholesaler

---

**16.** As discussed in Part V *infra*, Western also had a monopoly over the Twin Cities-Las Vegas route, and operated a plan known as the Group 60 Fare, the seats for which were very much in demand by travel agencies.

**17.** Hard competition * * * is neither unfair nor a violation of the antitrust laws * * * the antitrust laws were not designed to immunize competitors from the public-serving

rigors of the market place; rather they were supposed to advance the system of free competition to the fullest extent practicable, all to the end that the consuming public might receive better goods and services at lower prices.

*General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc.*, 421 F.Supp. 274, 290–91 (N.D.Cal.1976).

and retailer) usually 80—occasionally 124— seats on a round trip basis under the Group 60 Fare. As of September 1973, Western consistently allocated to MSAA and Mainline Travel the most preferred space to Las Vegas.

Because these Group 60 Fare seats were in demand by travel agents, Western received complaints that the most preferred space was allocated to MSAA and Mainline. This supply-demand imbalance gave Western market power leverage to impose its wishes on the travel agents.

On September 25, 1973, Western and MSAA officials held a meeting, at MSAA's request, in connection with which the Special Master made the following findings of fact:

49. Western and MSAA officials met in MSAA's Bloomington headquarters on September 25, 1973. Western officials at the meeting were Lynn Zumbrunnen and Jon Meyers; MSAA officials present were Robert Rossman, Arthur Tomlinson, and Duane Edberg.

50. MSAA officials tried to point out the more blatant misstatements in the ad. Zumbrunnen, however, refused to discuss them. Zumbrunnen stated he was instructed by Balfour, his superior, not to discuss the ad with MSAA officials.

51. Zumbrunnen's statements and conduct forced MSAA to recognize its dependence on Western's continued preferential treatment of MSAA on Group 60 tariffs to Las Vegas, Western being the only direct, non-stop carrier to Las Vegas. MSAA became aware that its continued promotion of TGCs would jeopardize its ability to market the Group 60 tariff with Western.

52. By reason of the statements and conduct of Western officers, MSAA officials felt it best to cooperate with Western and not to proceed with MSAA's planned TGC operations with ITA.

53. Shortly after the meeting, and as a direct result of it, MSAA announced that it was cancelling the Hawaii and Mexico TGCs planned with ITA.

54. MSAA based its decision on the decrease in public interest caused by Western's anti-TGC campaign and on the potential reduction of MSAA's preferred Group 60 space.

55. Shortly after MSAA cancelled its Hawaii and Mexico TGCs with ITA, MSAA cancelled its London TGCs planned with ITA for the same reasons.

As is clear from the Special Master's wording in Findings of Fact number 51 and number 52, the Special Master *did not specifically find* that Western told MSAA that unless MSAA cancelled its TGCs planned with ITA, that Western would not allocate any Group 60 Fare seats to MSAA. However, in the Special Master's Memorandum of Law, he states "veiled threats were issued to the effect that MSAA's preferential treatment on Western's Group 60 flights would be jeopardized if it continued to participate with ITA in the operation of TGCs," and "[t]he combination of this threat and the fear of decreased public interest in TGCs caused by Western's ad prompted MSAA to cease its participation in the joint ITA/MSAA TGC program."

And in his Findings of Fact the Special Master *did find* that Western, through Zumbrunnen's statements and conduct at the meeting, caused MSAA to cooperate with Western and to cancel the Hawaii, Mexico and London TGCs. An additional cause of the cancellation of the TGCs was Western's effective anti-TGC campaign.

We are satisfied that there is sufficient evidence to support the Special Master's findings. The evidence includes the fact that the power of leverage by Western was established; that there was evidence presented from which the Special Master may have concluded that such leverage had been used in the past; that it was established that MSAA had an "awareness" of the leverage and power that Western possessed; that Zumbrunnen's testimony revealed that the subjects of the Group 60 Fare seats and Western's Hawaii market were both discussed at the meeting; that on October 5, 1973, the Hawaii TGCs were cancelled by MSAA, the Mexico TGCs were

rescheduled and then later cancelled; and that the London TGCs were cancelled on October 25, 1973.[18]

■ It is not our function to try this case *de novo*, to pass upon credibility of witnesses or to determine the weight to be given to any particular testimony. *Stanley v. Henderson*, 597 F.2d 651, 653 (8th Cir. 1979). We can only declare a finding of fact clearly erroneous if there is not substantial evidence to support it, if it evolves from an erroneous conception of the applicable law, or if, upon considering the entire record, we are left with a definite and firm conviction that a mistake has been made. *Bowers v. Kraft Foods Corp.*, 606 F.2d 816, 818 (8th Cir. 1979); *Southern Illinois Stone Co. v. Universal Engineering Corp.*, 592 F.2d 446, 451 (8th Cir. 1979).

We affirm the Special Master's Findings of Fact in connection with the appearance, content and result of the September 25 meeting.

VI. Monopolization—Sherman § 2

■ To show, as a matter of law, monopolization under section 2, Western must be shown to possess monopoly power, willful acquisition or maintenance of that power, *Purex Corp. v. Procter & Gamble Co.*, *supra*, 596 F.2d at 890, and of course, causal antitrust injury. *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 892 (8th Cir. 1978).

■ The Special Master found there to be monopoly power by Western over the Hawaii and Las Vegas flights from the Twin Cities and Western does not contest these findings.

As to the second element, willful maintenance of the monopoly power in this case, all activities discussed in connection with the section 1 claim (unreasonable restraint of trade) are relevant to the section 2 claim in that they contributed to the willful main-

tenance of Western's monopoly power over the Hawaii route by preventing TGCs, and consequently the Hawaii TGCs, from becoming a competitive threat to Western's Hawaii monopoly route.

As to the September 25 meeting, Western's use of the Las Vegas air route power it possessed to eliminate the competition of ITA's TGCs to Hawaii is clearly as a matter of law, willful maintenance of the Hawaii air route monopoly. Thus, the Special Master was correct in finding a section 2 violation.

The effects of the section 2 violation are addressed with the effects of the section 1 violation in Part VII, *infra*.

VII. Causation of Fact of Injury and Damages

■ In a private antitrust suit, the plaintiffs must show the violation and additionally must show "to a reasonable certainty that there has been injury to them by reason of" the violation. *Admiral Theatre Corp. v. Douglas Theatre Co., supra* 585 F.2d at 893. Additionally, "the damages accruing from the injury must be capable of reasonable ascertainment and must not be speculative or conjectural." *Id.* Yet, even with this caution in regard to ascertainment of damages—"the jury may not render a verdict based on speculation or guesswork," *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946)—the Supreme Court has also stated

> in the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injury plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

> \* \* \* \* \* \*

---

**18.** Western points out that the meeting was called by MSAA to discuss the ad, and that the ad was cancelled following the meeting. Western argues from this that it is inconsistent to conclude that MSAA was threatened by Western in regard to MSAA's participation in TGCs. Apparently, it is Western's contention that if

MSAA succeeded in having Western cancel the ad, then MSAA had the upper hand throughout the entire meeting. We perceive no inconsistency in both of these topics, cancelling the ad and cancelling the TGCs, being discussed, and the finding of a threat by Western.

* * * [T]he jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act upon probable and inferential, as well as direct and positive proof."

*Id., quoting Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 564, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931). *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

More recently, the Supreme Court has stated in regard to the causal injury requirement:

[The plaintiffs] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4.

*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129 (1969).[19]

**A. *Sherman Act § 1, Fact of Injury and Causation***

We first examine the fact of injury and causation requirements with reference to the Sherman § 1 claim. This division between the section 1 claim and the section 2 claim is analytically necessary because the effect under section 1 (of the violation) is relevant in determining the reasonableness of the restraint of trade.

The Special Master found, with respect to the Sherman § 1 claim,

43. Travel Center, another locally based travel agency, after September 16, experienced a sharp drop in the quantity and rate of bookings and requests for promotional literature on the Hawaii TGCs it had been advertising. As a result of the effects of the Western ad, Travel Center had to promote group travel through companies and organizations as it had done before TGCs came into existence in order to fill the flights it had booked, in effect, converting its TGC flights to split-charter flights.

44. Customer sign-ups and inquiries on Mainline's Hawaii TGCs, first advertised on August 12, 1973, declined after the publication of the ad.

45. Customer sign-ups and inquiries on the ITA/MSAA-sponsored TGCs, first advertised on September 2, 1973, increased after publication of the ad. [The Special Master noted in his memorandum that "although MSAA's TGC requests increased slightly, this may be attributable to a normal delay in response to ITA's advertisements of its TGC program."]

* * * * * *

56. Requests from travel agents for blocks of seats on Mainline's Hawaii TGCs decreased significantly immediately following the mailing of the "Dear Partner in Travel" letter and the publication of the ad.

There is sufficient evidence in the record to support all these findings.

Additionally, the Special Master found that Western's anti-TGC campaign was the cause of the decrease in public interest in TGCs. This is supported by testimony that immediately after the September 16 ad appeared, there was generally a drop in inquiries, bookings, requests, etc., concerning TGCs. Similar testimony was given concerning requests from travel agents after the letter, including a copy of the ad, was mailed. Also, there was testimony that there were questions by the general public concerning the appearance of the ad and asking questions about the ad.

---

**19.** *See also Foremost International Tours, Inc. v. Qantas Airways, Ltd.,* 478 F.Supp. 589, 595 (D.Hawaii 1979) ("The court assumes that plaintiff, if it could demonstrate the violations alleged, would sustain some form of cognizable antitrust injury as a result of such violations, plaintiff being in direct competition with the defendants in the relevant market.").

This general showing of a decrease in favorable inquiries concerning the TGCs, combined with the showing of the degree of success of TGCs in the past is sufficient to demonstrate a significant fact of injury causally related to the anti-TGC campaign. Further, the negative effects of the anti-TGC campaign support our earlier finding of a section 1 unreasonable restraint of trade. In addition, of course, these effects establish causation of injury sufficient to satisfy a section 1 private cause of action claim.

B. *Sherman Act § 2, Fact of Injury and Causation*

As to the Sherman Act § 2 claim, the above discussion concerning the decrease in TGC requests is applicable, as the section 1 claim is enveloped within the section 2 claim. MSAA's cancellation as wholesaler for ITA's TGCs clearly, by itself, created injury. The Special Master found:

68. MSAA and ITA committed themselves to plans to operate four TGCs to Hawaii in 1974. The four MSAA/ITA TGCs to Hawaii had been advertised at the time Western published its ad in the Twin Cities papers. ITA could not market these TGCs without the assistance of MSAA.

\* \* \* \* \* \*

75. ITA and MSAA had also firmly committed themselves to running four TGCs to Mexico in the first quarter of 1974, and, in fact, they had begun advertising them prior to the time Western published its anti-TGC ad in the Twin Cities. Because of Western's conduct, MSAA cancelled these TGCs. ITA could not market these TGCs without MSAA's assistance.

\* \* \* \* \* \*

82. At the time Western published its anti-TGC ad in the Twin Cities, MSAA planned to run 13 TGCs to London in 1974 with ITA. These 13 TGCs constituted a program distinct and independent from the TGCs to Europe that ITA planned to run and actually did run on its own in 1974.

83. Because of Western's conduct, MSAA cancelled these TGCs. Absent Western's conduct, all 13 TGCs to London would probably have operated successfully. ITA suffered a loss of profits and its damages are not difficult to ascertain.

The section 2 causation issue was implicitly discussed in Part VI, *supra* ; the willful maintenance of the monopoly (the threat at the meeting) and the unreasonable restraint of trade (the effects of the anti-TGC campaign) caused the cancellation of the TGCs by MSAA.

C. *Damages*

■■■ As to the issue of damages, Western does not dispute the method for calculating damages nor does Western dispute the amount. The disputed issue is whether or not, but for these activities, the TGCs would have succeeded. In other words, by deciding that but for the antitrust violations the TGCs would have succeeded, did this result in a just and reasonable estimate of the damages.

Western particularly argues that the London flights were not firmed up and thus giving damages for these flights was speculative. As the Special Master states in his Memorandum of Law, "[w]hile plans for the London TGCs had not been firmed up at the time MSAA cancelled, this was not because of the parties' lack of interest but rather because of their preoccupation with Mexico and Hawaii TGCs. This preoccupation is understandable in view of the fact that the Mexico and Hawaii TGCs were scheduled for the winter of 1974, while the London TGCs were not to depart until the following summer."

As the Fifth Circuit stated in *Heatransfer Corp. v. Volkswagenwerk, A. G.,* 553 F.2d 964, 986–89 n.20 (5th Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978) and as quoted by our court in *TV Signal Co. v. AT&T,* 617 F.2d 1302 (8th Cir. 1980):

[T]he Court does not believe that a going concern, which is the victim of an anticompetitive practice, must forego dam-

ages for sales it would have made as the result of the natural expansion of its business simply because it was victimized early in its existence before its attempts to expand could ripen into evidence of preparedness and intent to increase its output. Thus, the question for the Court's determination is whether, under the facts of the present case, the manufacture of units for each type of Volkswagen vehicle in the relevant market can be considered the expansion of a present business into a new market for purposes of standing, *or simply one facet of growth in an ongoing business for purposes of damages.* The line to be drawn between expansion into new areas and growth in established ones is not easily defined and one that must be determined from the facts of each case.

*Id.* at 1308.

Also, Western argues that it did nothing to interfere with the proposed London TGCs—that Western did not serve London and did not care whether MSAA or anyone else sponsored TGCs to London. The record clearly shows that Western had engaged in an anti-TGC campaign and that this had an effect on TGCs over all; and that the overall effect on TGCs was one of the reasons that led MSAA to cancel its participation in the ITA TGC program. Finally, the Special Master found that the pressure applied at the September 25 meeting was in regard to all TGCs with ITA.

Based upon evidence of (1) past successes of TGCs; (2) increasing demand for vacation travel to Hawaii, Mexico and London; and (3) success of subsequent, albeit not necessarily the same type of charters, the Special Master concluded that the flights would have been successful. Thus, in accord with the Supreme Court's language in *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. at 264, 66 S.Ct. at 579:

> [T]he jury [in this case, the Special Master] could conclude as a matter of just and reasonable inference from the proof

of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, *not shown to be attributable to other causes,* that defendants' wrongful acts had caused damage to the plaintiffs.

*Id.* (emphasis added).

We hold that there is sufficient evidence to support the Special Master's findings in regard to damages.

### VIII. Attorney's Fees

Finally, Western contends the attorneys' fees awarded by the district court were excessive. ITA was awarded attorneys' fees of $213,390.87. This represents an award for the services of lead counsel Harold J. Tomin of $144,914.00; and an award for the services of Doherty, Rumble & Butler (Doherty), who acted as local counsel, of $68,476.87. This, together with costs of $10,771.40 and trebled damages of $361,-596.00 resulted in a total award by the district court to ITA of $585,758.27.

Western's contentions concerning the excessiveness of attorneys' fees can be summarized as follows: (1) the hours and hourly rate awarded Tomin were excessive; (2) the hours and hourly rate awarded Doherty were excessive, and the use of a contingency multiplier was improper; and (3) the contingency fee agreement between ITA and its counsel resulted in such a large amount of fees actually being paid to its attorneys by ITA, that this court should reduce that amount by exercising its supervisory powers over the bar.

We begin by examining the Special Master's award of reasonable attorneys' fees pursuant to 15 U.S.C. § 15.[20] In *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), this court agreed that the proper approach in determining an award of attorney's fees in antitrust cases is the approach used in the Second and Third Circuits. The factors to consider are:

---

**20.** The district court adopted all of the Special Master's findings and conclusions concerning the award of attorneys' fees, except that it corrected a mathematical error. *International Travel Arrangers v. Western Airlines, Inc.,* No. 4–74 Civil 256 (D.Minn. Feb. 26, 1979).

a) the number of hours spent in various legal activities by the individual attorneys,

b) the reasonable hourly rate for the individual attorneys,

c) the contingent nature of success, and

d) the quality of the attorneys' work.

*Id.* at 127. *See Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973) *(Lindy I), appeal from decision on remand,* 540 F.2d 102 (3d Cir. 1976) *(Lindy II). See also City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974) *(Grinnell I), appeal from decision on remand,* 560 F.2d 1093 (2d Cir. 1977) *(Grinnell II);* Merola v. Atlantic Richfield Co., 493 F.2d 292 (3d Cir. 1974).[21]

Although the above cases involved class actions in antitrust cases, we agree that "the principles of *Lindy* are applicable to an award of attorney's fees pursuant to 15 U.S.C. § 15," *Pitchford v. Pepi, Inc.,* 531 F.2d 92, 110 (3d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976).

The starting point in determining attorney's fees is to arrive at a "lodestar" figure by multiplying an hourly rate by the number of hours worked. It is only after this calculation is made that less objective factors may be applied. *Grunin v. International House of Pancakes, supra,* 513 F.2d at 127–28; *Lindy II, supra,* 540 F.2d at 116–17; *Grinnell I, supra,* 495 F.2d at 470.

The purpose of the fees award under 15 U.S.C. § 15 is to insure that a successful plaintiff in an antitrust action does not have its treble damage recovery unduly diminished by the payment of fees to its attorneys. *Perkins v. Standard Oil Co.,* 474 F.2d 549, 553 (9th Cir.), *cert. denied,* 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400 (1973); *Farmington Dowel Products Co. v. Forster Manufacturing Co.,* 421 F.2d 61, 88 (1st Cir. 1970); *Locklin v. Day-Glo Color Corp.,* 378 F.Supp. 423 (N.D.Ill.1974). Re-

covery of attorney's fees under 15 U.S.C. § 15 of course accrues to the plaintiff and not its attorneys. *First Iowa Hydro Electric Coop. v. Iowa-Illinois Gas & Electric Co.,* 245 F.2d 630–32 (8th Cir. 1957), *cert. denied,* 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1958).

The standard applied by this court in reviewing a 15 U.S.C. § 15 attorney's fees award is whether the district court's findings were clearly erroneous as to the factual basis for the award, or whether it committed abuse as to the discretional margin involved in its allowance. *Armco Steel Corp. v. State of North Dakota,* 376 F.2d 206, 212 (8th Cir. 1967). *See Grunin v. International House of Pancakes, supra,* 513 F.2d at 126. Nevertheless, "it is the duty of appellate courts to protect against 'vicarious generosity' in the matter of attorney fees [in antitrust cases]." *Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp.,* 194 F.2d 846, 859 (8th Cir.), *cert. denied,* 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952). *Cf. Locklin v. Day-Glo Color Corp., supra,* 378 F.Supp. at 426. ("Overgenerosity, in particular, must be guarded against so as to maintain public respect for and confidence in the organized bar.").

In cases involving substantial actual damages, courts test the reasonableness of the attorney's fees award by examining the ratio of the attorney's fees to the untrebled damage award. *Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., supra,* 194 F.2d at 859; *Milwaukee Towne Corp. v. Loew's, Inc.,* 190 F.2d 561, 571 (7th Cir. 1951), *cert. denied,* 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952). The attorneys' fees awarded by the district court are $213,390.87, which is approximately 177% of the untrebled damage award of $120,532.00. While we reject a per se rule applied by some courts that the attorney's fees award should be limited to the amount of the untrebled damages,[22] the high ratio is a

---

**21.** Other factors which might be considered appear in *Morning Pioneer, Inc. v. Bismarck Tribune Co.,* 493 F.2d 383, 390 n.15 (8th Cir. 1974). *See also Locklin v. Day-Glo Color Corp.,* 378 F.Supp. 423, 426 (N.D.Ill.1974).

**22.** This court has stated only that the fee must bear a reasonable relationship to the amount of untrebled damages. *Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp.,* 194 F.2d 846, 859 (8th Cir. 1952).

factor to consider and requires a close examination of the fee award.[23]

### A. *Fees Awarded for Services of Harold Tomin*

 Harold Tomin has served as lead counsel for ITA in this action. This is his first trial of an antitrust case as lead counsel, although he has participated in the preparation, trial, and settlement of a number of antitrust cases. When he began this case he had been practicing law for over eight years, and had approximately twelve years of legal experience at the time of trial. The Special Master found "he demonstrated the ability of a competent and skillful trial attorney."

Tomin, from the Los Angeles area, stated his normal billing charge during that period varied from $75.00 to $90.00 per hour. The evidence indicated that in Minneapolis-St. Paul the rate would be lower for someone with his experience. Western also argues that he should be paid at the rate at the time he earned it, and notes the rates were much lower in 1974. *See Locklin v. Day-Glo Color Corp., supra,* 378 F.Supp. at 427. However, it is our view that such analysis on review would then require detailed examination of other factors (such as the inflationary shrinkage since the time the work was performed) and that it was therefore reasonable for the Special Master to conclude $80.00 per hour was a reasonable "lodestar" fee for Tomin. The Special Master then awarded a $10.00 per hour bonus for the contingency nature of the case, and we cannot say this was an abuse of discretion.

Tomin claimed 1699 hours were expended by him, and the Special Master awarded ITA fees based on 1572.85 hours. We con-

clude the trial court was clearly erroneous in finding Tomin contributed this many hours when time records were kept for only 772.75 hours. While we do not disallow all reconstructed hours, we believe the court in *Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1368 (2d Cir. 1978) properly held that uncertainties should be resolved against the plaintiff, if arising because of imprecise recordkeeping without adequate justification. The record supports the Special Master's finding that for the period of February 1974 through May 1974 Tomin was associated with a firm that dissolved and the records were unavailable. A similar conclusion is reached for the period from August 1975 through January 1976. We cannot say the Special Master's findings as to the time allowed for these periods are clearly erroneous. Additionally, we will not reduce as excessive the hours for which records were properly kept and introduced at the hearing before the Special Master.

A similar conclusion cannot be made concerning other periods, however. From April through June 1977, Tomin's records indicated he spent 77.5 hours on the case, but he asked the court for 450 hours and was awarded 350 hours. Because of his lack of records, and based on the affidavit of defendant's counsel concerning the time needed for pretrial activity (120.5 hours for defense counsel), we conclude 150 hours is all that could be found to be reasonable for this period.

The Special Master awarded 250 hours for trial time. We find it unreasonable to assume Tomin spent more than 200 hours, again based on affidavits of defendant's counsel (182 hours recorded trial time) and the fact the only evidence of Tomin's hours

---

We note that at least one court has approved an award of attorney's fees which far exceeded the substantial untrebled damage figure. *Pitchford Scientific Inst. Corp. v. Pepi, Inc.,* 440 F.Supp. 1175 (W.D.Pa.1977), *aff'd,* 582 F.2d 1275 (3d Cir. 1978).

**23.** In reviewing the award of attorney's fees, this court has expressed the following caveat:

A party is not entitled needlessly to accumulate exorbitant legal fees with the expectation

that the losing party will be called upon to pick up the entire tab. This court will exercise vigilance and pare down needless and unconscionably high legal fees. An award of attorney's fees is compensatory, not punitive, * * *.

*Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action,* 558 F.2d 861, 871 (8th Cir. 1977) (award of attorney's fees pursuant to 42 U.S.C. § 1988).

are records apparently reconstructed six months later.

Western also claims it should not be penalized for ITA hiring counsel from Los Angeles, and seeks to have travel time between Los Angeles and Minneapolis excluded. Tomin has charged travel time for at least ten round trip flights billing twelve or more hours of time for each round trip. We would not disallow all travel time (the magistrate excluded two trips), but it is our view that defendant should not be charged a premium for ITA's choice of out of town counsel, *Kane v. Martin Paint Stores, Inc., supra,* 439 F.Supp. at 1056. The award will be reduced by fifty hours due to insufficient evidence the flight time involved work on this case. *See Locklin v. Day-Glo Color Corp., supra,* 378 F.Supp. at 429–30.

We therefore conclude a reasonable award of fees for Tomin's services would require a reduction of 300 hours from the Special Master's findings. As a result ITA should receive an award of $117,914.00 as reasonable attorney's fees for Tomin's work, based on the trial court's award of $144,914.00 less $27,000.00 (300 hours × $90.00 per hour).

### B. *Fees Awarded for Services of Doherty, Rumble & Butler*

As local counsel for ITA, Doherty, Rumble & Butler received fees of $68,476.86. This was based on hourly fees multiplied by the hours worked for a total "lodestar" amount of $43,089.75. The Special Master then multiplied the lodestar amount by a factor of 1.5 based on the contingency nature of the work and its quality. Doherty kept precise records, and we do not question the Special Master's award of hours, nor the hourly rate determinations.[24] However, we think it was unreasonable to award Doherty a 1.5 multiplier in this case.

As the Third Circuit has explained,

Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good. \* \* \* [T]he increase or decrease reflects exceptional services only; it may be considered in the nature of a bonus or penalty. The heavy burden of proving entitlement to such an adjustment is on the moving party.

*Lindy II, supra,* 540 F.2d at 118. *See also Grinnell II, supra,* 560 F.2d at 1100. The Special Master's conclusory language about quality of work and the risk involved does not satisfy this requirement. *Grinnell II, supra,* 560 F.2d at 1100. The majority of the risk in this case was with Tomin, and the Special Master reasonably applied to his hourly rate a $10.00 per hour bonus factor, which is about a 12.5% increase in the hourly rate. Pursuant to a normal fee arrangement, ITA had paid Doherty approximately $3,800.00 in attorney fees and $3,000.00 in disbursements up to July 12, 1977, the time of the trial. At that time ITA and Doherty agreed future attorney fees for trial work were contingent on success, and would be the amount awarded by the court pursuant to 15 U.S.C. § 15. In any event, the firm was to be reimbursed for necessary expenses it incurred.

The 1.5 multiplier as a bonus to the hourly rate would result in some of the Doherty attorneys receiving in effect $135.00 for their services ($90.00 × 1.5). Additionally, Boyd Ratchie, who served as second chair in the case and was inexperienced in antitrust litigation, would have been compensated in effect at a rate of $112.50 per hour ($75.00 × 1.5). ITA has not met the heavy burden of proving entitlement to such an adjustment. *Lindy II, supra,* 540 F.2d at 118. We therefore find it excessive and reduce the award to the straight-time figure of $43,089.75.[25]

---

**24.** The Special Master made the following rate determinations for members of Doherty: The principal participating attorney, Boyd Ratchie, $75.00 per hour; senior partners, $90.00 per hour; associates $35.00–$55.00 per hour; and assistants, $16.00–$29.00 per hour.

**25.** Western asks that we disallow time spent on the jury trial before the magistrate, and make further reductions for duplications of effort because two firms were involved in the work. With regard to this latter point, this court will not interfere with the decision of ITA and its two counsel to divide the burdens of a complex

## C. *Contingency Fee Agreement Between ITA and Its Counsel*

The private contingency fee agreement between ITA and its counsel requires separate consideration. The court has the power and the responsibility to monitor contingency fee agreements for reasonableness. ABA Canons of Professional Ethics No. 13; *Dunn v. H. K. Porter Co.*, 602 F.2d 1105, 1108–09 (3d Cir. 1979); *Farmington Dowel Products Co. v. Forster Manufacturing Co., supra*, 421 F.2d 61 (1st Cir. 1970) (*Farmington Dowel I), appeal of decision on remand*, 436 F.2d 699 (1st Cir. 1970) (*Farmington Dowel II* ).

We feel that under the circumstances of this case we must examine the reasonableness of the fee agreement. Tomin testified at the hearing before the magistrate with regard to his fee arrangement with ITA, and at oral argument before this court explained the manner in which his fee was determined. We have inserted the figures awarded under 15 U.S.C. § 15 into this formula, and have made the following approximations: From the total award (treble damages plus costs and attorneys' fees), which adjusted by our reductions in attorneys' fees is $533,371.15, is deducted the fees for Doherty, Rumble & Butler ($43,089.75) and costs and expenditures in the case made by ITA (estimated by Tomin to be $30,000.00). Tomin is to receive 45% of this remaining figure, $460,281.40, or approximately $207,126.63. Doherty, Rumble & Butler agreed to receive only what the court awards ITA for the services of the firm, which is $43,089.75.

These computations indicate that the attorneys altogether will take home approximately $250,000.00 of the total award of $533,371.15. This is 47% of the total award going to the attorneys.

The role of the court in awarding a reasonable fee under 15 U.S.C. § 15, and in exercising its supervisory power over the bar by examining contingency agreements between attorney and client, differs greatly.

> The first requires the court to arrive at a figure it considers reasonable; the second requires it to arrive at a figure which it considers the outer limit of reasonableness. The first determination is made without reference to any prior agreement between the parties; the second must take account of the fact that an agreement, if freely made, is not lightly set aside.

*Farmington Dowel I, supra*, 421 F.2d at 90. Our inquiry here is therefore limited to whether the fee agreement yields a fee which is "[beyond the] outer limit[s] of reasonableness." *Id.*

There are several factors to consider in determining reasonableness for the purposes of the Canons of Ethics, many of which have little applicability for purposes of an award pursuant to 15 U.S.C. § 15. We examine, *inter alia*, the reasonableness of the fee arrangement according to the circumstances in which it was made, the fact it is contingent on success, the status of sophistication of the plaintiffs, and whether the plaintiff remains willing to abide by the contract.[26] One factor not

---

trial between the counsel. *See Computer Statistics, Inc. v. Blair*, 418 F.Supp. 1339, 1351 (S.D.Tex.1976). Concerning the jury trial which was later ruled invalid by the district court, we note both parties stipulated to the jury trial. While we disagree with the contention of ITA that the jury trial did not require more attorney time than would a bench trial, we do agree ITA should not be denied this time simply because a higher court ruled the jury trial invalid. As stated in *Pitchford Scientific Inst. Corp. v. Pepi, Inc., supra*, 440 F.Supp. at 1178 (footnote omitted)

[we reject] defendants' contention that because the case was tried twice counsel is not entitled to compensation for work done at the second trial, on the theory that such work was "duplication." It seems clear that it is reasonably necessary to retry a case when an appellate court directs a retrial. Counsel are not to be penalized by being required to work for nothing as punishment for failure to know at the first trial what the Court of Appeals was going to do.

26. *See, e. g., Dunn v. H. K. Porter Co.*, 602 F.2d 1105, 1110 (3d Cir. 1979); *Farmington Dowel I, supra*, 421 F.2d at 89–90. *See also* ABA Canons of Professional Ethics No. 12; ABA Code of Professional Responsibility DR 2–106(B).

conclusive is that the contingency fee agreement—formulated to satisfy needs other than those contemplated by 15 U.S.C. § 15—exceeds the section 15 award. *Dunn v. H. K. Porter Co., supra*, 602 F.2d at 1112.

In examining all the relevant factors, we note that Doherty, Rumble & Butler is receiving only its reasonable fees under 15 U.S.C. § 15 ($43,089.75) and the court finds no reason to intrude in its fee arrangement with ITA. In fact, we agree with the Third Circuit "that the courts should be loathe to intrude into a contractual relationship between an attorney and client." *Id.*[27]

We are also reluctant to intrude in the agreement entered into between Tomin and ITA. Tomin's fee arrangement results in his being paid approximately 39% of the total award ($207,000.00 of $533,371.15) which he contends is in line with normal contingency rates. There is no question, however, that his award must be considered in light of the fact other attorneys' fees were also being paid by ITA to Doherty for its involvement in the case. The fact that 47% of the substantial total award will be paid to attorneys is disturbing. We reiterate that the major purpose for the statutory award for attorney's fees was to prevent substantial diminution of the plaintiff's trebled damage recovery. *Farmington Dowel I, supra*, 421 F.2d at 88 n.60. That the client freely entered into the contract and is apparently willing to abide by it is relevant but not controlling. *Id.* at 89 n.61.

We conclude the fee agreement between ITA and Tomin results in a fee which exceeds the outer limits of reasonableness. Without rejecting the formula used by To-

min in all cases, considering the fees awarded other counsel and the substantial damage award,[28] our supervisory power requires us to reduce the fee which ITA must pay Tomin pursuant to its contingency fee agreement.

Our examination of the circumstances of this case leads us to conclude that the outer bounds of reasonableness require that the fee paid by ITA to Tomin under their contingency fee agreement be limited to 45% of the treble damage award of $361,596.00. This is approximately $162,718.20, as compared with the $207,126.63 fee we computed *supra* to be his fee according to the agreement.[29]

In view of the issues raised on appeal, and our disposition of these issues, ITA will be awarded $5,000.00 pursuant to 15 U.S.C. § 15 as a reasonable sum for attorneys' fees in defending its verdict on appeal. *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679, 692 (8th Cir. 1966) (Blackmun, J.). *See also Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 55–56 (5th Cir. 1976); *Farmington Dowel I, supra*, 421 F.2d at 91–92. In addition court costs on appeal are awarded to ITA and against Western.

We affirm the district court's conclusion that Western violated the Sherman Act §§ 1 and 2; we affirm the damages awarded to ITA. We reduce the attorneys' fees for the reasons discussed above.

---

**27.** The First Circuit has reaffirmed its belief that " 'court intervention in fee dispositions is bound to be confined to exceptional circumstances.' In *[Farmington Dowel II]* we set a high standard for a showing of reasons for 'the court's decision to declare less than the amount resulting from the fee agreement as the maximum which could ethically be received.' " *Sargeant v. Sharp*, 579 F.2d 645, 648 n.4 (1st Cir. 1978) (quoting *Farmington Dowel II, supra*, 436 F.2d at 701).

**28.** It has been noted that

[a] fair and equitable contingent fee agreement generally provides for a sliding scale in which fees based on a percentage of the total

recovery decrease as the amount of the recovery increases. *See Pollard v. United States*, 69 F.R.D. 646, 649 (M.D.Ala.1976); *Milstein v. Werner*, 58 F.R.D. 544, 551–52 (S.D.N.Y.1972); *State of Illinois v. Harper & Row Publishers, Inc.*, 55 F.R.D. 221, 223 (N.D.Ill.1972).

*Dunn v. H. K. Porter Co., supra*, 602 F.2d at 1113 n.12.

**29.** Of course the attorney's fees awarded ITA by the court for the services of Tomin under 15 U.S.C. § 15 ($117,914.00) can be used to satisfy the contingent fee.