M. D. VICKERMAN, et al., Plaintiffs,

v.

HENNEPIN COUNTY PROBATE COURT, et al., Defendants.

Edward William WILSON, et al., Plaintiffs,

v.

HENNEPIN COUNTY PROBATE COURT, et al., Defendants.

Civ. Nos. 4–78–376, 4–78–153.

United States District Court, D. Minnesota, Fourth Division.

May 26, 1982.

William F. Messinger, Beverly Balos, Charles K. Dayton, Minneapolis, Minn., for plaintiffs.

Warren Spannaus, Atty. Gen. by Ellen C. Dubuque, Sp. Asst. Atty. Gen., St. Paul, Minn., and David E. Mikkelson, Asst. County Atty., Minneapolis, Minn., for defendants.

### ORDER

MILES W. LORD, Chief Judge.

### I. INTRODUCTION

This action for attorneys' fees derives from a consolidated civil rights action brought by individuals subject to a civil commitment proceeding in Hennepin County on behalf of themselves and others similarly situated.[1] The underlying litigation concerned violations of 42 U.S.C. § 1983 in which plaintiffs alleged the civil commitment process pursuant to Minn.Stat. 253A *et seq.* was violative of due process. Furthermore, the plaintiffs claimed that Hennepin County failed to provide adequate community alternatives for the mentally ill. Jurisdiction was premised upon 28 U.S.C. § 1343.

The case of E. W. Wilson[2] and Linnea Gatton[3] vs. Melvin Peterson, Jeff Spartz,

---

1. The class was defined as follows:

   All persons in Hennepin County since March 28, 1976, who were, are now, or in the future may become subjects of a request to the Hennepin County Probate Court to file a petition for commitment as mentally ill under Minn.Stat. 253A.07 et seq., or who are committed or hospitalized as mentally ill pursuant to such proceedings.

   Excluded from the class were persons committed as inebriate (pursuant to Minn.Stat. 253A.07(17)(d)), mentally deficient (pursuant to 253A.07(17)(b)), mentally ill and dangerous (pursuant to 253A.07(17)(c)), and psychopathic personalities (pursuant to Minn.Stat. 526.09); also excluded were persons subject to proceedings under Rule 20 of Minn.R.Crim.P. and under Minn.Stat. 253A.23 for mental evaluations. *See* August 26, 1980, Stipulation (hereinafter "Stipulation") Section III.B. at 6; December 29, 1980, Consent Decree (hereinafter "Consent Decree") at 8.

2. Plaintiff Edward William Wilson was, at the time the suit was brought, a resident of Michigan. While in Minnesota, Wilson was confined on a locked psychiatric ward at Golden Valley

3. See note 3 on page 167.

Thomas Ticen, Richard Kremer, John Derus, E. R. Robb, Sam Sivanich and Nancy Olkon (hereinafter *Wilson*) was commenced on April 13, 1978. Subsequent to the filing of the *Wilson* case, the United States Supreme Court decided *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell*, the Court held that local governing bodies could be sued as "persons" under 42 U.S.C. § 1983 where the action alleged to be unconstitutional implements or executes a policy or decision officially adopted or promulgated as official policy. Pursuant to *Monell*, the plaintiffs through M. D. Vickerman[4] brought a second action against the Hennepin County Board, the Hennepin County Probate Court, the Hennepin County Board of Commissioners and the Honorable Melvin Peterson, Hennepin County Probate Judge. This second action (hereinafter *Vickerman*) was commenced on August 31, 1978. *Wilson* and *Vickerman* were consolidated on November 30, 1978.

During 1979 there were a minimum of 1,700 chronically mentally ill individuals and a minimum of 4,890 individuals requiring mental health services in nursing homes in Hennepin County.[5] From November 1, 1978, through October 31, 1979, approximately 955 petitions containing an allegation of mental illness were set for hearing in Hennepin County Probate Court. At least 400 of those petitions resulted in a commitment for mental illness. Of those 400 individuals committed for mental illness, more than 150 were committed indeterminately for more than 60 days.[6] As of April 1980, approximately 140 persons committed for mental illness remained hospitalized for more than one year at Anoka State Hospital.[7]

This litigation required fifteen court appearances and a minimum of eighteen separate negotiation sessions with opposing counsel over a period of two and one-half years. The litigation resulted in a 38 page written stipulation (dated August 26, 1980) and consent decree (dated December 29, 1980) providing millions of dollars for a variety of community alternatives and improved constitutional guarantees to the plaintiff class. Specifically, the stipulation provided for the expenditure of $16,537,000 from January 1, 1981, through December 31, 1985, for the development of a variety

Health Center on March 28, 1978 pursuant to a "hold order" issued by the Probate Court under Minn.Stat. 253A.07 (1978). Wilson was committed to Golden Valley Health Center as mentally ill by the Probate Court on April 7, 1978.

3. Plaintiff Linnea Gatton was, at the time the suit was brought, a resident of Carver County, Minnesota. At the time of the filing of the complaint, she had been committed twice under Minn.Stat. 253A. The second commitment was by the Hennepin County Probate Court on June 15, 1977. Ms. Gatton was found mentally ill by the Probate Court and sent to Anoka State Hospital where she was subsequently released. Her commitment hearing was held at the Golden Valley Health Center. Prior to the hearing, a petition for judicial commitment had been filed in Carver County on June 3, 1977, following which an order was issued by a Carver County Court directing the County Sheriff to apprehend and transport Ms. Gatton to Golden Valley Health Center where she was to be confined. She was admitted to Golden Valley Health Center that same date. On June 8, 1977, the Hennepin County Probate Court accepted a transfer of venue from Carver County and issued its own order confining Ms. Gatton to Golden Valley Health Center. While at Golden Valley, Ms. Gatton received medications against her will and was held in the locked psychiatric ward.

4. Plaintiff M. D. Vickerman was, at the time the suit was brought, a resident of Hennepin County, Minnesota. He had previously been committed by the Hennepin County Probate Court as mentally ill pursuant to Minn.Stat. 253A (1978). On July 27, 1978, a physician signed a statement in support of Mr. Vickerman's emergency hospitalization as a mentally ill person. On July 28, 1978, the Hennepin County Probate Court issued an order confining Mr. Vickerman to the locked psychiatric ward at Golden Valley Health Center. He was committed to this facility by the Probate Court following a commitment hearing on August 8, 1978. He was confined to the locked psychiatric ward on various occasions following his commitment.

5. Stipulation 7, Consent Decree 8–9.

6. Stipulation 7, Consent Decree 9.

7. Stipulation 8, Consent Decree 9.

of community-based mental health programs focusing primarily, but not exclusively, on the needs of the adult chronically and seriously mentally ill in Hennepin County. The stipulation provided for the implementation of certain procedural and due process considerations such as pre-petition screening, post-petition/prehearing orders, representation of the prospective patient by an attorney, examination, commitment hearing, sixty-day hearing, quarterly review and annual hearing. Amended to the stipulation (and incorporated by reference) was a five-year directional plan for mental health services for the adult chronically and seriously mentally ill.

## II. THE FEE REQUEST

The full request before this Court is $309,062.14. This consists of $285,355.68 for attorneys' fees and costs directly relating to the case at bar and $23,706.46 for preparing and compiling the fee application. Mr. Messinger claims $250,749.78 and Ms. Balos claims $34,605.90 as their fees and costs in this matter. Mr. Messinger's total of $250,-749.78 is derived from 1730.5 hours at $90 per hour and employing a multiplier of 50% ($233,617.50), 70.2 hours of employee assistance concerning non-class data at $38.07 per hour and employing a multiplier of 50% ($4,008.75), 272.4 hours of employee assistance concerning class data at $20 per hour and employing a multiplier of 50% ($8,172.00); also included are non-class costs of $3,531.83 and class costs of $1,419.70. Ms. Balos' total of $34,605.90 is derived from 329.58 hours at $70 per hour and employing a multiplier of 50%. The multiplier of 50% is justified by a composite of three separate multiplier factors: delay in payment (20%), contingency or likelihood of success (15%), and class benefit (15%).

The $23,706.46 for preparing and compiling the fee application is derived from $22,-839.00 in attorneys fees and $867.46 in costs. Mr. Dayton, who assisted in the preparation of the fee application, claims $8,295.00 (82.-95 hours × $100 per hour). Mr. Messinger claims $10,701.00 (118.9 hours × $90 per hour) and Ms. Balos claims $3,843.00 (54.9 hours × $70 per hour). The costs break down to $154.42 for Mr. Dayton and $713.04 for Mr. Messinger.

## III. DISCUSSION

### A. Fee Computation in the Various Circuits

There are two general approaches to computing attorney fee awards. The first is commonly known as the lodestar method. It was first set forth by the Third Circuit in *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973). Basically this method consists of three steps: (1) multiplying hours times the attorneys' regular billing rate—this results in a lodestar amount, (2) adjusting that lodestar amount for risk or contingency factors, and (3) adjusting the amount again for the quality of work performed. This approach was first developed in an antitrust suit and remains popular for such cases. *See Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3rd Cir. 1975); *Prandini v. National Tea Co.*, 557 F.2d 1015 (3rd Cir. 1977); *Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208 (3rd Cir. 1978); *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 395 (D.D.C.1978).

The second approach to fee computation was announced by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Essentially, the *Johnson* approach consists of 12 factors: (1) the time and labor required, (2) the novelty and difficulty of the question, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client and (12) awards in similar cases.

Initially, this approach found support in both Congress and the courts. *See Barber v. Kimbrell's Inc.*, 577 F.2d 216 (4th Cir. 1978); *King v. Greenblatt*, 560 F.2d 1024 (1st Cir. 1977). *See also* S.Rep.No.94–1011, 94th Cong., 2nd Sess., 6 (1976) *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5913. (Legislative History to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988). Unfortunately, while some of these factors were useful in arriving at fair fee awards, there was little direction given as to how to use the various factors. As a result a number of courts criticized using the *Johnson* factors as the sole method of determining attorneys' fees. *See, e.g., Detroit v. Grinnell Corp.*, 495 F.2d 488, 470 (2d Cir. 1974); *Northcross v. Bd. of Education of Memphis*, 611 F.2d 624, 642 (6th Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.E.2d 862 (1980). Even the Fifth Circuit has moved away from its deference to the unguided use of the *Johnson* factors and has formally adopted a methodology similar to the lodestar method. *See Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575 (5th Cir. 1980).

At first the Eighth Circuit embraced the *Johnson* method of fee computation. *Doe v. Poelker*, 515 F.2d 541, 548 (8th Cir. 1975), *rev'd on other grounds* 428 U.S. 909, 96 S.Ct. 3220, 49 L.Ed.2d 1216 (1976); *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876, 884 (8th Cir. 1977). Apparently, because the *Johnson* method often resulted in awards which were less than the number of hours claimed times the attorney's regular hourly rate, the Court moved closer to adopting the lodestar method. *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 252 (8th Cir. 1978). *Zoll* therefore appears to require the District Court to employ the *Johnson* factors only to raise an award over the lodestar amount. *See also Cleverly v. Western Electric Co.*, 594 F.2d 638, 642 (8th Cir. 1979). Under unusual circumstances, however, a court may use the *Johnson* standards to reduce the fee requested by counsel. *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1273–74 (8th Cir. 1981) (extremely low quality representation); *Robinson v. Moreland*,

655 F.2d 887, 891–92 (8th Cir. 1981) (plaintiff prevailed over only one of the original defendants); *Ladies Center, Nebraska, Inc. v. Thone*, 645 F.2d 645, 647 (8th Cir. 1981) (inefficient use of time). The Eighth Circuit, therefore, has adopted a hybrid ("lodestar-Johnson") analysis for attorneys' fees.

This hybrid analysis is characterized by three recent cases. In *Jorstad v. IDS Realty Trust*, 643 F.2d 1305 (8th Cir. 1981), the Court stated:

> Since the "starting point in determining attorney's fees is to arrive at a 'lodestar' figure by multiplying an hourly rate by the number of hours worked," *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, [8 Cir.] *supra* 623 F.2d [1255] at 1274, it is particularly important that those rates which are applied be, in fact, reasonable hourly rates. In *Grunin v. International House of Pancakes*, [8 Cir.] *supra*, 513 F.2d [114] at 127, this court adopted the standards to be considered in calculating attorneys fees which were previously set forth by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167–68 (3d Cir. 1973) (*Lindy I* ), and reiterated in *Merola v. Atlantic Richfield Co., supra*, 493 F.2d at 297:
>
> > (a) the number of hours spent in various legal activities by the individual attorneys,
> >
> > (b) the *reasonable* hourly rate for the *individual attorneys,*
> >
> > (c) the contingent nature of success, and,
> >
> > (d) the quality of the attorneys' work.
> >
> > . . . . These standards were recently reaffirmed in this circuit in *International Travel Arrangers, Inc. v. Western Airlines, Inc., supra*, 623 F.2d at 1274.

*Id.* at 1312–13.

In *Ladies Center, Nebraska, Inc. v. Thone*, 645 F.2d 645 (8th Cir. 1981), the Court of Appeals noted:

170

This court has expressly adopted the guidelines for attorney fees set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *See Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 252 (8th Cir. 1978); *Allen v. Amalgamated Transit Union, Local 788*, 554 F.2d 876, 884 (8th Cir.), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977). As noted in *Zoll*, 588 F.2d at 252 n. 11:

> In assessing attorney's fees, the district court should consider twelve factors: (1) the time and labor required, (2) the novelty and difficulty of the question, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client and (12) awards in similar cases.

*Id.* at 647.

The lodestar analysis of *Jorstad* and the *Johnson* analysis of *Ladies Center* coalesce in *Robinson v. Moreland*, 655 F.2d 887 (8th Cir. 1981), where the Court remarks:

> The trial court correctly stated the governing legal principle: that the court should ordinarily award the number of hours claimed, multiplied by the attorney's regular hourly rate. The trial court, however, may award a lesser amount if it finds a lesser award appropriate under the factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), provided the court states its reasons for so doing.

8. Mr. Messinger's lodestar figure does not include Mr. Messinger's employee hours, as per his request, since the non-lawyer employee expenditures are, according to *Jorstad*, properly

*See Ladies Center, Nebraska, Inc. v. Thone*, 645 F.2d 645 at 647 (8th Cir. 1981). *Id.* at 891.

Of course, the *Johnson* factors can still be used to raise an award over the lodestar amount. *See Cleverly v. Western Electric Co.*, 594 F.2d 638 (8th Cir. 1979); *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246 (8th Cir. 1978).

B. Analysis

■ Since the starting point is for the Court to arrive at a lodestar figure, it is with this computation that we begin. *Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1312 (8th Cir. 1981); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1274 (8th Cir. 1980), *cert. denied* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980); *Grunin v. International House of Pancakes*, 513 F.2d 114, 127 (8th Cir. 1975), *cert. denied* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Plaintiffs' attorneys have submitted a total of 2,060.08 hours expended on this matter, not including time spent on the fee application or hours submitted on behalf of various paraprofessionals. Of this total, 1730.5 hours are claimed by William Messinger[8] and 329.58 hours are claimed by Beverly Balos. As noted above Mr. Messinger is requesting a $90 an hour billing rate and Ms. Balos is requesting a $70 an hour billing rate. Thus, the lodestar for Mr. Messinger is $155,745. The same computation for Ms. Balos yields $23,070.60. The total lodestar figure is then $178,815.60.

This $178,815.60 represents the base fee amount. The next inquiry involves a determination whether the number of hours expended and the hourly rate are reasonable, the former being the first *Johnson* factor, *see, e.g., Ladies Center, Nebraska, Inc. v. Thone*, 645 F.2d 645, 647 (8th Cir. 1981), and the latter being specifically addressed in the lodestar method, *see, e.g., Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1313 (8th Cir. 1981).

considered as an expense. *See Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1315 (8th Cir. 1981); *see* note 10 *infra*.

Both the State and the County have questioned the reasonableness of the hours submitted by the plaintiffs' attorneys. The trial court "remains free to determine ... the number of hours which should be required to completely prepare and try a case...." *Brown v. Bathke*, 588 F.2d 634, 638 (8th Cir. 1978). One of the justifications for the claimed number of hours is the complexity of the legal and factual issues presented by this case, issues which have never before been litigated in this state. Yet, as defendants point out, the substantive constitutional issues of due process and right to treatment in a less restrictive setting were never litigated, but settlement was reached well before extensive trial preparation was necessary. The issues actually litigated were procedural in nature. These involved such standard federal court practice problems as abstention, immunity and motions to compel discovery. In the Court's opinion, the nature of the case did not merit the number of hours billed. As a result, this Court reduces the total number of hours by 25%. This reduction results in 1297.875 hours for Mr. Messinger and 247.185 hours for Ms. Balos, for a total of 1545.06 hours.

The second inquiry concerns the reasonableness of the hourly rate. According to *Jorstad*, the reasonable hourly rates to be applied in that case were $80 per hour for senior attorneys and $40 per hour for associates. *Jorstad* at 1313. However, the *Jorstad* decision was rendered over one year ago. Since that time, the Consumer Price Index for Minneapolis has risen 14.7%. Therefore, Mr. Messinger's request for $90 an hour, a 12.5% increase over the *Jorstad* reasonable hourly rate for senior attorneys, is a reasonable hourly rate. The line between a partner and an associate is a difficult one to discern. Why by calling an attorney an associate rather than a partner one is automatically reduced to a lesser hourly rate has not always been clear to this Court. Nevertheless, in this instance Ms. Balos had been in practice only a couple of years when she worked on this matter. Therefore, her request for $70 an hour, though it may be very reasonable and much

deserved is nevertheless in the absence of evidence to the contrary, reduced in light of *Jorstad* to $55 an hour.

In sum, the lodestar figure requested in this case is $178,815.60, consisting of $155,745.00 for Mr. Messinger (1730.5 × $90) and $23,070.60 for Ms. Balos (329.58 × $70). Mr. Messinger's lodestar figure is reduced for the reasons stated above from $155,745.00 to $116,808.75 (1297.875 × $90). Ms. Balo's lodestar figure is reduced for the reasons stated above from $23,070.60 to $13,595.17 (247.185 × $55). The adjusted lodestar figure for attorneys' fees on the merits now totals $130,403.92.

■ The analysis next proceeds to a consideration of the contingent nature of success (risk) and quality factors inherent in the case. The moving party bears a heavy burden in proving entitlement to an increase for risk or quality. *Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1314 (8th Cir. 1981); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1276 (8th Cir. 1980). As noted above, the plaintiffs' attorneys request a 50% multiplier. The multiplier breaks down in the following manner: (1) 15% for likelihood of success, (2) 20% for delay in payment, (3) 15% for class benefit. No multiplier is claimed for quality of representation. This multiplier increases Mr. Messinger's adjusted lodestar total to $175,213.12 and Ms. Balos' adjusted lodestar total to $20,392.75, for a total of $195,605.87.

Under the rubric of "the contingent nature of success," the Court should consider both the likelihood that the plaintiffs would prevail and the delay in receipt of payment for services rendered. *Lindy Brothers Builders Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 117 (3rd Cir. 1976); *accord International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1274 (8th Cir. 1980). One of the factors to be considered when determining whether a particular case presents a high degree of risk is the number of hours of labor risked without guarantee of remuneration. While the Court recognizes that the

plaintiffs' attorneys did risk working a significant number of hours without pay, it finds that a 15% multiplier is unreasonable given the nature of this case. Rather, this Court finds a multiplier of 5% for contingency or likelihood of success reasonable and appropriate.

The next factor to be considered is delay in payment. Delay in payment is always a concern in instances of protracted litigation where counsel must in some manner make ends meet. In some cases, defense counsel contribute to the protracted nature of the litigation in part because they feel little need to wrap matters up quickly as their clients pay promptly when billed. *See McPherson v. School District No. 186*, 465 F.Supp. 749, 762 (S.D.Ill.1978). Prompt payment allows for investment or other use of one's money. The petitioners were denied this luxury. Even though the need for a delay in payment multiplier is lessened by the use of the attorneys' present hourly rate, this does not completely alleviate the need to consider this factor. Although a multiplier of 20% for delay in payment is excessive under these circumstances, this Court finds a multiplier of 5% to be reasonable.

The final factor to be considered is class benefit. Some courts have treated this factor under the rubric of quality of representation. *See, for example, Lindy Brothers Builders Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 118 (3rd Cir. 1976). Insofar as the petitioners' request no multiplier for quality of representation but do make such a request for class benefit, the Court will treat it as a *Johnson* factor to be considered apart from either risk or quality. The Eighth Circuit, as well, appears to treat this as the eighth factor under *Johnson* and adjusts the award accordingly. *Robinson v. Moreland*, 655 F.2d 887, 891 (8th Cir. 1981); *Planned Parenthood Association of Kansas City v. Ashcroft*, 655 F.2d 848, 872 (8th Cir. 1981).

Petitioners request a multiplier of 15% for class benefit or results of the litigation. This Court is convinced of the reasonableness of this request. This litigation was instrumental in the development of community alternatives for the mentally ill and the enforcement of due process protections for persons subject to commitment proceedings. The stipulation provided for a five year expenditure of over $16 million for the development of a variety of community-based mental health programs. The need for attention in this area of human services has been poignantly detailed by the Minnesota Supreme Court Study Commission on the Mentally Disabled in their final report entitled *Civil Commitment in Minnesota* (1979). But the real benefit of this litigation cannot be depicted simply in monetary or legal terms; the real benefit, the results which truly make a difference, is reflected in human terms. No longer will people such as Kenneth Donaldson (of *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)), be foisted off into a mental institution for an indefinite, and potentially permanent, period of time without future recourse to the courts.

A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.

*Id.* at 575, 95 S.Ct. at 2493.

Thanks in part to *Vickerman*, a preliminary hearing is now held within 72 hours of the proposed patient's confinement so that an unjustified confinement is quickly discovered. Procedural protections in the commitment process are substantially improved as a result of this litigation. Indeterminately committed persons are now entitled to a review of such commitment on a quarterly basis and are also entitled to an annual hearing conducted by an impartial hearing officer. Moreover, the statutory requirement of placing the patient in the least restrictive environment necessary for the welfare of the patient is given meaning

by the development and maintenance of the residential and non-residential programs provided for in the stipulation. Without alternatives to complete institutionalization, the requirement of selecting the least restrictive alternative is meaningless. The five year expenditure of over $16 million for the development of a variety of community-based mental health programs guarantees that, at least in Hennepin County, the legislative mandate does not become an illusion of procedural fairness. Considering all of the many benefits that resulted from this litigation, this Court finds that a multiplier of 15% for class benefit or results is totally justified and unquestionably reasonable.

In summary, this Court finds the composite multiplier of 50% to be excessive and reduces it to 25%, consisting of 5% for delay in payment, 5% for contingency or likelihood of success, and 15% for class benefit or results of the litigation.[9] Thus, the total attorneys' fees stand at $163,004.90 ($130,-403.92 × 1.25), consisting of $146,010.93 for Mr. Messinger (1297.875 hours × $90 × 1.25) and $16,993.97 for Ms. Balos (247.185 hours × $55 × 1.25).

Mr. Messinger's adjusted expenses incurred on the merits total $13,072.04. This total is derived from $6,204.34 for non-class expenses and $6,867.70 for class expenses. The non-class expenses ($6,204.34) consist of $2,672.51 for employee assistance concerning non-class data (70.2 hours × $38.07) and $3,531.83 for costs. The class expenses ($6,867.70) consist of $5,448.00 for employee assistance concerning class data (272.4 hours × $20) and $1,419.70 for costs.[10]

The Court finds these costs to be reasonable.

## IV. THE FEE APPLICATION

■ The Eighth Circuit Court of Appeals in *Jorstad* considered the time and expenses incurred in processing the fee application as justified for two reasons: First, where compensation for attorneys' fees is authorized by statute, "[t]the awards are justified ... because 'the fees are not paid out of the plaintiffs' recovery,' and thus do not diminish their benefit." *Jorstad* at 1314, quoting *Prandini v. National Tea Co.*, 585 F.2d 47, 52–53 (3rd Cir. 1978), and citing *Bagby v. Beal*, 606 F.2d 411, 415 (3d Cir. 1979). Second, "in justifying their application for fees in this case, class counsel were forced to bear the additional burden of proving the benefits of their efforts to the class members." *Jorstad* at 1315. Both of these requisites—if indeed they are requisites—have been satisfied in the instant case. The monetary aspects of the consent decree will not be reduced by the fees award. Furthermore, the benefit to the class—and to the public at large—has been sufficiently proved and, as a matter of fact, is admitted by defendants in the stipulation and in later requests for funding from private foundations for implementation of the five year plan.

---

**9.** One federal district court has gone so far as to double the awards, using a multiple of 2.0, due to the contingent nature of the suit; *Wells v. Hutchinson*, 499 F.Supp. 174 (E.D.Tex.1980). Other courts have also given substantial increases for the same reason. *See, e.g., Taylor v. Jones*, 495 F.Supp. 1285, 1297 (E.D.Ark. 1980) (increase of lodestar by 20%); *Dorfman v. First Boston Corp.*, 70 F.R.D. 366 (E.D.Pa. 1976) (increase of lodestar by 50%). An increase of the lodestar in the realm of public interest law has been deemed especially appropriate by the Fifth Circuit Court of Appeals:

> Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result. This is neither less nor more appropriate in civil rights litigation than in personal injury cases. *The standard of compensation must enable counsel to accept apparently just causes without awaiting sure winners.*
>
> *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981) (emphasis added).

**10.** It is apparent from *Jorstad* that time spent by non-attorney personnel is considered as an expense and therefore not subject to an increase by employing a multiple. *See Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1312–13, 1315 (8th Cir. 1981). Thus, Mr. Messinger's request of $4,008.75 for employee assistance concerning non-class data (70.2 hours × $38.07 × 1.5) and $8,172.00 for employee assistance concerning class data (272.4 hours × $20 × 1.5) is excessive since a multiplier is employed; this requested amount has been appropriately reduced to straight time.

The fee application request totals $23,-706.46. This figure is derived from $22,-839.00 in attorneys' fees and $867.46 in expenses. Of the $22,839.00 in attorneys' fees, Mr. Dayton claims $8,295.00 (82.95 hours × $100), Mr. Messinger claims $10,-701.00 (118.9 hours × $90), and Ms. Balos claims $3,843.00 (54.9 hours × $70). As mentioned above Ms. Balos' rate of $70 per hour is excessive and is reduced to $55 per hour. This reduction lowers Ms. Balos' award for fee application attorneys' fees from $3,843.00 to $3,019.50 (54.9 hours × $55), thereby lessening the total fee application attorneys' fees amount from $22,839.00 to $22,015.50. The $867.46 claim for expenses incurred in the fee application process is derived from $154.42 for Mr. Dayton's expenses and $713.04 for Mr. Messinger's expenses. Thus, the attorneys fees of $22,-015.50 and the expenses of $867.46 equal a total fee application request of $22,882.96.

The Court finds the above sum for the fee application to be fair and reasonable.

In sum, this Court awards the following:

| | |
|---|---|
| Mr. Messinger: | $170,497.01 |
| Ms. Balos: | $ 20,013.47 |
| Mr. Dayton: | $ 8,449.42 |

## V. APPORTIONMENT OF RESPONSI-BILITY FOR PAYMENT OF THE AWARD

The final issue to be resolved is the correct apportionment of this award as between the State of Minnesota and Hennepin County. The Court is not unfamiliar with this kind of dispute. *See Hartmann v. Gaffney,* 446 F.Supp. 809 (D.C.Minn.1977). The State argues that due to its late entry and its relatively low profile in the case, it should be liable for only 10% of the award. The County argues that because it has no independent authority in this area but must do what the State of Minnesota directs

through its Legislature or its State agencies, it should not be liable for anything more than 25%. The Court finds that a 50%–50% division is the most equitable solution.[11]

IT IS HEREBY ORDERED.

---

11. On April 2, 1981, this Court dismissed the Honorable Melvin Peterson, Hennepin County Probate Judge, as a defendant in these actions. As a result, no proceeding for attorneys' fees could be maintained against him. Nevertheless, the Court finds it appropriate to remark that even if Judge Peterson had not been dismissed, we would not have awarded any attorneys' fees against him as he has no control over his budget or the number of personnel available to perform the functions of his court. These matters are determined solely by Hennepin County or by the State of Minnesota.